JOHN SHALLA, Appellee, v. HARLEY H. SHALLA, Appellant.

No. 46882.

July 29, 1946.

Will J. Hayek and Emil G. Trott, both of Iowa City, for appellant.

Edward L. O'Connor, of Iowa City, for appellee.

MILLER, J.—Plaintiff's petition alleged: On February 12, 1941, defendant executed and delivered to plaintiff a note for $2,250 due February 12, 1951, with interest at five per cent until maturity and seven per cent thereafter, payable at the office of T. M. Fairchild, attorney at law, Iowa City, Iowa, secured by a mortgage upon Lot 5, Block 1, Pleasant Place Addition to Iowa City, Iowa; the mortgage was duly recorded on February 20, 1941; on or about March 24, 1941, defendant represented to plaintiff that he had an opportunity to sell the mortgaged premises, it would be necessary for plaintiff to release his mortgage to permit defendant to give good title, defendant would pay the full amount due on the note if plaintiff would release his mortgage; plaintiff believed said statements, relied thereon, and pursuant thereto released said mortgage on March 24, 1941; thereafter defendant did not sell said property and did not pay the amount due on said note; sometime later defendant, without plaintiff's knowledge or consent, gained possession of said note and mortgage and has refused to deliver same to plaintiff, has secreted same and is attempting to appropriate same to his own use and benefit; the note and mortgage provide that the holder may declare the whole sum due and payable on default; defendant has paid $30 interest only and has been in default since August 12, 1941; the court should set aside said release and reinstate said note and mortgage and decree plaintiff to be the owner and holder thereof; plaintiff, as the owner and holder of said note and mortgage, has elected and, by the commencement of this action, does elect to declare the principal and accrued interest thereon due and payable and the mortgage foreclosable; the release of said mortgage was procured by fraud and misrepresentation in that defendant never intended to sell said premises or to pay plaintiff the amounts due him but intended to deprive plaintiff of said note and security; the amount due on said note on November 20, 1944 (return day), was $2,893.55. The prayer was that the release of the mort-

gage be found to have been without consideration, procured by fraud and misrepresentation, and be canceled, that plaintiff have judgment for $2,893.55, with interest, attorney's fees, and costs, that the mortgage be foreclosed, and for general equitable relief. Copies of the note and mortgage were attached to the petition, marked Exhibits A and B, and were incorporated therein by reference.

Defendant's answer in Division I denied, on "insufficient information to form a belief," the execution of the note and mortgage; denied that Exhibit B, attached to the petition, was a copy of a mortgage signed by him, admitted that it was shown of record and released but denied the allegations as to the circumstances under which it was released; denied substantially all other allegations of the petition and prayed that the action be dismissed.

Division II of the answer asserted: About May 6, 1929, defendant was induced by plaintiff to execute a note for $5,300 due May 1, 1932, secured by a mortgage on said Lot 5, Block 1, Pleasant Place Addition, which was recorded May 10, 1932; plaintiff only paid $2,200 therefor; on June 5, 1933, this mortgage was released but plaintiff gave no receipt for the payment made; plaintiff is defendant's father and stated that no receipt was necessary because he would never take advantage of his son; defendant made additional payments and rendered services at plaintiff's request and substantial payments and credits should have been given him by plaintiff; defendant's indebtedness to plaintiff was reduced to approximately $300, but plaintiff, through fraud and duress, induced defendant in February 1941, to execute certain instruments in the office of T. M. Fairchild, plaintiff's attorney, but defendant was not aware of the type of instruments he was executing, did not receive a copy thereof, and received no consideration therefor; if Exhibits A and B, attached to plaintiff's petition are copies of said instruments, defendant denies liability thereon on the ground of fraud and lack of consideration; while defendant was in military service from October 28, 1942, to March 31, 1943, plaintiff received the income from said property to apply on the balance of indebtedness of approximately $300; in addition thereto defendant performed

services in painting, electric wiring, and other labor, the value of which should be credited on said indebtedness with other payments, the amount of which defendant does not now recall and has no record on; in June or July 1943, plaintiff admitted the indebtedness was fully paid. The prayer was for dismissal of the action.

Division III of the answer asserted that plaintiff was precluded from maintaining this action on a lost note without filing an indemnifying bond and prayed 'that such a bond be required and, on failure to file same, the action be dismissed.

About a month after the filing of the answer defendant filed a motion for judgment on the pleadings, which asserted that Division II of the answer alleged payment as an affirmative defense and plaintiff failed to controvert same within seven days after the answer was filed; that, under the provisions of Rule 102 of the Rules of Civil Procedure, the defense of payment is deemed to have been admitted and defendant is entitled to dismissal of the action. This motion was resisted by plaintiff on the ground that Division II of the answer was equivocal and indefinite, was not sufficient to constitute a confession and avoidance, and was inadequate to present the affirmative defense of payment. The court overruled the motion. Defendant then filed an amendment to answer, which was verified, and specifically denied that defendant gave or signed the note as alleged in plaintiff's petition and specifically denied that any note such as Exhibit A as alleged in plaintiff's petition has been lost by plaintiff. Plaintiff promptly filed a reply which specifically denied each and every allegation of an affirmative nature in the answer, denied the defense of payment, and alleged that defendant has never paid off the balance due plaintiff as alleged in plaintiff's petition.

The testimony of the witnesses was in sharp conflict on many of the questions of fact herein. The trial court made certain findings of fact and conclusions of law which were quite general. We will undertake to make a preliminary statement of the high lights of the testimony for the purpose of giving a general over-all picture of the controversy upon which the trial court based its decree.

The three principal witnesses were the plaintiff, John Shalla, age seventy-four at time of trial; his son, the defendant, Harley H. Shalla, age forty-two at the time of trial; and Mrs. Julia Shalla, mother of defendant and divorced wife of plaintiff. Their testimony shows that Harley Shalla acquired title to the residence property, Lot 5, Block 1, Pleasant Place Addition to Iowa City, in 1929.. The purchase price was $5,300. At that time Harley and his then wife gave his father a note and mortgage for the full purchase price. Harley testified that he contributed $3,000 and ,that his father actually paid only $2,300 on the place. Mr. Shalla testified that he paid the full $5,300 and Harley repaid him $3,000. The conflicts in the testimony over the time that Harley paid the $3,000 are not important here because that amount of credit was admittedly due Harley in any event.

The dispute herein involves the question whether $2,225 was due on this indebtedness on February 12, 1941, when the note and. mortgage here ˙sued upon were allegedly executed by Harley in the office of T. M. Fairchild, attorney for plaintiff. Harley and his mother were present with Mr. Fairchild. Plaintiff was not present. Mr. Fairchild died July 21, 1945, about two months before trial but his yearbook was produced, in which was an entry as follows:

"Feb. 12, 1941, Harley H. Shalla and his mother appeared and I wrote a new note $2,250.00 and redated the mortgage I had drawn in January 1941 and he signed both giving his father John Shalla a mtg on the property therein described.. Note and mtg dated Feb. 12, 1941."

Harley testified that he and his mother were in Mr. Fairchild's office and described the incident thus:

"I remember going to Mr. Fairchild's office with my mother on or about February 12, 1941. My father asked me to go up there. He told me that I was supposed to go up to sign up some papers. I don't remember whether he told me what the papers were, but I imagine they was something about the place out there. When I got up there, I recall of signing only one paper, about the size of this Exhibit E [a warranty deed]. There wasn't anything explained to me as to what

the paper represented. I was too nervous and excited about everything to read anything. I don't remember signing anything the size of a promissory note; it was bigger, a sheet about the same size as Exhibit E. After that, I don't remember that my father at any time called my attention to the fact that I owed him any money or asked for any payment of any note.''

Harley's mother does not appear to have testified concerning the meeting with Mr. Fairchild. Plaintiff testified as follows:

''I was not in the office of T. M. Fairchild, attorney at law of Iowa City, Iowa, on February 12, 1941. My son Harley H. Shalla owed me $2,225.00 on February 12, 1941. On or about that date a note and mortgage for $2,250.00 was delivered to me by T. M. Fairchild. The note was signed by my son, Harley H. Shalla. It was the same thing in form as Exhibit 3. After I received the note on or about February 12, 1941, from attorney Fairchild, I put it in my lockbox in Welt's Agency. I left it there until May, 1941, when I took all the papers out of the lockbox and took them home. I had the note with the rest of the articles and bonds and stuff that I brought home with me, and I put them in the cupboard as usual where I always do. I do not have the note in my possession now. It was taken. All the papers that was with the note and mortgage were taken. My past wife says that she distributed them amongst the children and each one took their own that had their name on. I wasn't divorced at the time. My son Harley H. Shalla wasn't living with me at that time —he stayed there now and then when he took a notion. It was some time in May that I first heard my wife say that she had distributed my papers, including this note and mortgage and other papers, to her two sons. I was trying to find them so's I could get in connection with Welt on the mortgages that I had there. The whole thing was gone; I couldn't find anything. I didn't talk with my son, the defendant, Harley H. Shalla, with reference to where this note and mortgage was but I did with my wife. I was present in court on the trial of my divorce case while my son Harley H. Shalla was

testifying and heard him say that he picked the mortgage and note up off the kitchen table.''

Plaintiff testified that the mortgage was recorded and later released, his testimony being as follows:

''I put the original mortgage on record with the county recorder and then I put it in my lockbox. The mortgage record that the deputy recorder identified was the recording of the mortgage that I got from Mr. Fairchild on or about' February 12, 1941. I executed the marginal release which appears on the mortgage record. The reason I executed the release was that my son Harley H. Shalla, the defendant, told me to take the mortgage off, that he had a buyer for the property, Charlie Rittenmeyer, who didn't want the mortgage on it, who wanted the property clear when he got it from us—from him. I believed that what my son told me was true at that time. Mr. Rittenmeyer rang me and asked me if I'd release that mortgage and I said I would. After I had this talk with my son, Harley, the defendant, and after he told me that he had a buyer for the property, and after he told me who it was, and after he told me that the buyer wanted clear title and asked if I wouldn't release this mortgage, I went down and wrote this release on the margin of the mortgage record on March 24, 1941. From the time I got the note and mortgage on February 12, 1941, until the date of the release, March 24, 1941, my son Harley H. Shalla did not pay me any money to apply on the note and mortgage. On March 24, 1941, when I released the mortgage, my son owed me the full amount of the mortgage, $2,250.00. I did not voluntarily turn the note and mortgage over to the defendant, Harley H. Shalla. After I had released the mortgage, I had a conversation with my son, Harley H. Shalla, with reference to the deal about selling this property and he told me that the buyer didn't accept the property. I asked him with reference to renewing the note and mortgage six or eight times a year, I suppose, from the 24th of March up, and he hasn't made any attempt to renew it, and I could not force him to do it unless I brought him to a suit, and I haven't been able to get him to renew the note and mortgage to this day.''

On redirect examination plaintiff testified:

"On February 12, 1941, when I got the note and mortgage from Attorney Fairchild that was signed by the defendant, Harley H. Shalla, the amount Harley owed me was $2,225.00 rather than $2,250.00. Mr. Fairchild probably made a mistake in making out the mortgage and note for $2,250.00."

Defendant and his mother denied that defendant obtained the note and mortgage and testified to certain payments on the indebtedness. Their testimony as to said payments was somewhat indefinite. Both of them emphasized that plaintiff refused to give receipts for payments and sought to explain their testimony by reason of the loose manner in which the family affairs were handled. Mrs. Shalla was openly hostile and bitter against her divorced husband. Plaintiff stanchly denied that any payments were made on principal after February 12, 1941, and stated that only two payments of $15 each were made to apply on interest.

The record is over one hundred pages in length and obviously we cannot set it out at length herein. At the close of the testimony, the trial court observed:

"And it's very apparent to the Court that someone has done some lying in this case. It might have been intentional or it might have been done under mistaken fact. There is no question but what there was a lot of looseness in business dealings here between the parties. While it may be true that the relationship of father and son should to some extent break down a strictly business basis, when that relationship exists, it's always a good plan, whether you're dealing with a parent or the parent is dealing with a son, to follow out strict business methods. This case will be difficult for the Court to determine, under the facts submitted and with the law to be applied."

The court's decree found that "under the whole record the plaintiff has sustained the burden of proof in establishing his cause of action"; that the release of plaintiff's mortgage "was secured by the defendant through misrepresentation and fraud and without any semblance of consideration on his part,"

and that plaintiff relied thereon in releasing the mortgage; "that the original note and mortgage securing same are lost and cannot be produced and that in lieu thereof the court should decree Plaintiff's Exhibit 4 and Plaintiff's Exhibit 1 as true and correct copies of the original note and mortgage declared upon"; that the principal of the note should be $2,225 instead of $2,250; that the only payments made thereon were two interest payments of $15 each and three payments of rent to Mrs. Shalla of $25 each. Judgment was entered for $2,787.71, with interest at seven per cent from the date of judgment, and foreclosure of the mortgage was ordered to secure payment of said judgment and costs. Defendant appeals to this court.

I. Defendant's first proposition asserts:

"The trial court erred in failing to require an indemnifying bond of the plaintiff as demanded by the defendant for the reason that such a bond was specifically required under section 9660 of the Code."

Section 9660, Code, 1939, which appears as section 541.200, Code, 1946, provides as follows:

"When an action is brought on a lost note, bond, bill of exchange, draft, certificate of deposit, or other evidence of indebtedness, upon demand of any defendant therein, a good and sufficient bond shall be given to indemnify and save harmless the defendants in said cause."

It is to be noted that defendant's demand for a bond was not contained in a motion therefor but in Division III of his answer.

Paragraph 8 of plaintiff's petition had alleged:

"8. That sometime later, the exact date of which Plaintiff cannot state, the Defendant gained possession of said note and mortgage and has refused to deliver possession of the same to the Plaintiff though requested to do so; that plaintiff has never delivered possession of said note and mortgage to the defendant; that without the Plaintiff's knowledge or consent, the Defendant took said note and mortgage from the

home of Plaintiff, has secreted the same and is attempting to appropriate the same to his own lawful use and benefit.''

In Division I of defendant's answer, he in effect denied that the note was ever executed by him. Division III alleged:

''By way of further defense, this defendant states:

''Par. 1. That plaintiff in his petition alleges to have lost the note alleged to have been signed by this defendant, a copy of which note is marked Exhibit 'A,' being attached to plaintiff's petition.

''Par. 2. Defendant further alleges that plaintiff is precluded from bringing any cause of action on a lost note without filing an indemnifying bond protecting defendant, all as provided by law.

''Wherefore, defendant asks that the court require plaintiff to furnish such an indemnifying bond to protect this defendant, which bond shall be such a good and sufficient bond as to save harmless this defendant; and in plaintiff's failure to file such bond, defendant asks that plaintiff's petition be dismissed, with costs.''

We are unable to find any place in the record where this alleged defense was called to the attention of the trial court or any other demand for a bond was made. The defendant's brief and argument in this court appears to be based upon the proposition that, under the allegations of the petition above quoted, the allegations of the answer above set out, and the court's finding, ''that the original note and mortgage securing same are lost and cannot be produced and that in lieu thereof the court should decree Plaintiff's Exhibit 4 and Plaintiff's Exhibit 1 as true and correct copies of the original note and mortgage declared upon,'' defendant had an absolute right to a bond under section 9660, Code, 1939.

Defendant's contention is unique. We have had no case cited to us where precisely the same question was presented to this or any other court and our research has not produced any. Defendant relies upon the following authorities: Newton Sav. Bk. v. Howerton, 163 Iowa 677, 145 N. W. 292;

In re Guardianship of Bradford, 214 Iowa 130, 241 N. W. 420; Burrows v. Goodhue, 1 (G. Greene) Iowa 48; Sterne v. South Jersey Title & Finance Co., 91 N. J. Eq. 363, 110 A. 589; First Nat. Bk. v. Wilder, 8 Cir., Colo., 104 F. 187; 17 R. C. L. 1192. We will discuss said authorities in the reverse order from which we have cited them.

The statement in 17 R. C. L. 1192 is a general statement of the reasons for requiring indemnity in the event of an action on a lost instrument. It demonstrates why the legislature should provide as it has in section 9660, Code, 1939, section 541.200, Code, 1946. The cases of First Nat. Bk. v. Wilder, supra, Sterne v. South Jersey Title & Finance Co., supra, Burrows v. Goodhue, supra, In re Guardianship of Bradford, supra, and Newton Sav. Bk. v. Howerton, supra, are illustrative applications of the general rule and the spirit of our statute.

As heretofore pointed out, defendant specifically denied that the note was lost and asked that plaintiff file a bond solely because the petition asserted that defendant had wrongfully secured possession of the note and mortgage and had refused to return them to plaintiff. The statute was not intended to apply to such a situation. The trial court was right in ignoring said Division III of the answer.

II. Defendant's second proposition asserts:

"The court erred in overruling defendant's motion for judgment on the pleadings for the reason that plaintiff's failure to reply within the time allowed to defendant's answer pleading payment admitted that defense."

We find no merit in the contention.

Defendant relies upon four Rules of Civil Procedure, to wit: Rules 222, 102, 73, and 85(c). Rule 222 provides: "Any party may, at any time, on motion, have any judgment to which he is entitled under the uncontroverted facts stated in all the pleadings * * *." Rule 102 provides as follows: "Every fact pleaded and not denied in a subsequent pleading, as permitted by these Rules, shall be deemed admitted, except allegations of value or amount of damage. Allegations of a reply shall be deemed denied by operation

of law." Rule 73 provides: "There shall be a reply to a counterclaim, and to new matter in an answer, responding thereto in the same manner that an answer responds to a petition, but not inconsistent with the petition." Rule 85(c) provides that a reply must be filed within seven days after the answer to which it responds. Obviously these Rules must be construed together. When they are so considered the fallacy of defendant's contention is readily apparent.

Defendant's theory is: Division II of his answer asserted the defense of payment; under Rule 102, if that defense was not denied by a reply, it stood admitted; no reply was filed within seven days and the defense stood admitted, entitling defendant to judgment. The fallacy of the argument lies in the fact that, under the pleadings herein, no such reply was required by our Rules of Civil Procedure.

As heretofore pointed out, Rule 102 must be read with Rule 73. This latter Rule provides that new matter in an answer must be responded to in the same manner that an answer responds to the petition. This means that the purpose of a reply is to complete the issues. Here the petition alleged that defendant had only paid $30 to apply on interest, had been in default since August 12, 1941, and the amount due on the note on November 20, 1944 (return day), was $2,893.55. When defendant alleged that the note was paid, such assertion completed the issue. A reply was not necessary for that purpose.

The early case of Stacy & Thomas v. Stichton & Co., 9 Iowa 399, 401, is directly in point. That was an action on a note. The petition alleged that the note was due and owing. The answer pleaded payment as a defense. Plaintiff introduced the note and rested. Defendant then moved for a dismissal on the theory that the answer, not being denied, should be taken as true. The trial court dismissed the action. On appeal, this court reversed, stating as follows:

"There was nothing in the answer rendering or needing a replication in order to complete the issue. Granting that defendants would not have been permitted to prove payment without setting it up in the answer, it by no means follows

that a replication was necessary. Such an averment is not an affirmative allegation, requiring a response within the meaning of section 1742 of the Code. The petition alleges that so much is *due and owing*. The answer denies this and says the whole amount claimed has been paid. Beyond this, while a response could work no injury, it was unnecessary to complete the issue.''

There is an additional factor in this case that demonstrates that no such reply as defendant contends for was required herein. As heretofore pointed out, plaintiff's petition asserted that the mortgage had been released. Under repeated holdings of this court, this was prima facie evidence of payment of the debt and placed the burden on the plaintiff to show that it was not so intended. In Larson v. Ames Church of Christ, 213 Iowa 930, 935, 239 N. W. 921, 923, involving foreclosure of a mortgage, this court stated:

''The action instituted by the plaintiff is in essence for a breach of contract for the non-payment of a specified sum of money. We said in Brenton Bros. & Leach v. Hill, 197 Iowa 125:

'' 'This court is firmly committed to the rule that, in actions upon contract where the breach relied upon for a recovery is a failure to pay according to the terms of the contract, and non-payment is alleged, the burden is upon plaintiff to establish such non-payment, even though the defendant has pleaded payment.'

''See, also, Howerton v. Augustine, 130 Iowa 389.

''The law is well settled that a release of a mortgage, as in this case, is, in itself, prima-facie evidence of payment, and the release imports extinguishment of the debt, as well as the mortgage; and the burden of showing that it is not so intended is on the creditor. It is sufficient to cite our own decisions involving this proposition. Will v. Brookhart, 149 Iowa 426; Sutherland v. Briggs, 182 Iowa 1170; Kuen v. Upmier, 98 Iowa 393; Townsley v. Townsley, 167 Iowa 226; Shaffer v. Zubrod, 202 Iowa 1062.''

Pursuant to the foregoing pronouncement and the cases therein cited, the burden was on the plaintiff to prove that

the debt was unpaid and that the release was not intended as evidence of payment of the debt. Plaintiff accordingly pleaded that it was not so intended and that the debt was unpaid. The defense of payment, asserted in the answer, completed the issue. A reply was not necessary for that purpose.

As heretofore pointed out, Rule 222 would authorize entry of judgment on the pleadings herein if defendant were entitled to such judgment under the uncontroverted facts stated in *all* the pleadings. Since the petition alleged that the debt was due and unpaid, it cannot be said that it was an uncontroverted fact stated in *all* the pleadings that the debt was fully paid. The trial court correctly overruled defendant's motion for judgment on the pleadings herein.

■ III. Defendant's third proposition asserts:

"The court erred in holding that the plaintiff sustained the burden of proving that the mortgage was released through fraud for the reason that such holding was contrary to the evidence and the authorities."

We find no merit in this contention.

Plaintiff's evidence on this issue has been heretofore quoted herein. Defendant testified as follows:

"Q. Now, you've heard the statement here made by your father that you asked him to release a mortgage in order that you could sell it free and clear of the mortgage lien; I'll ask you whether or not you ever had any intention during the last five years of ever selling the property? A. No, I didn't. Q. Did you tell your father that you wanted him to release the mortgage because you had a buyer in Charlie Rittenmeyer and he wanted to buy it free of the mortgage? A. No, sir. Q. Did you tell your father that anybody else wanted to buy it? A. No, sir. Q. And ask him to release the mortgage? A. No, sir. Q. In fact, Harley, did you even know that the mortgage was released until after this suit was brought? * * * A. No, I didn't. * * * Q. * * * When did you first learn that the mortgage had been released on this property? A. Well, I didn't know if it ever was released."

Charles Rittenmeyer testified for defendant as follows:

"I know John Shalla and have known him better than almost sixty years. I never had a conversation with him relative to buying a home owned by Harley Shalla. I never talked with John Shalla, telling him in substance that I wished to buy Harley Shalla's home and that I wanted him to release the mortgage to give a clear title. I never telephoned John Shalla at any time in words to that effect. I never contemplated or talked with Harley Shalla relative to buying this property. I never knew that Harley owned a home that was located any place on East Davenport Street."

Defendant cites various decisions of this court which hold the burden of proof to establish fraud rests on the party pleading it; fraud is never presumed; the presumption is that every transaction is free from fraud; mere suspicion of fraud does not warrant setting aside the release of a mortgage; fraud must be proved by clear, convincing, and satisfactory evidence **and a mere preponderance of the evidence is not sufficient.** We have no quarrel with the numerous decisions of this court that so hold. The difficulty is that, as applied to the record herein, they do not settle the question before us, because fraud is not the only basis asserted by plaintiff for setting aside the release of the mortgage and is not the only ground for affording such relief.

In 41 C. J. 821, 822, the general rule is stated thus:

"Fraud or forgery, accident or mistake, or want of authority, may be grounds for the cancellation of a release or discharge and the reinstatement of the mortgage. And generally this relief may be had where the mortgage shows some special equity, as a failure of the consideration on which the release was given, or the invalidity of a new mortgage which was given on the surrender and cancellation of the old, or where the mortgage was released upon the conveyance of the mortgaged property to a third person and the sale is rescinded or proves ineffective, or where the lien of the mortgage has failed because the title then held by the mortgagor is adjudged invalid, and he afterward acquires a confirmation of it."

Substantially the same rules are set forth in 36 Am. Jur. 938 to 941.

In Cherry v. Welsher, 195 Iowa 640, 644, 192 N. W. 149, 151, we stated:

"The lien of the mortgage is presumed to continue until the debt is paid even though a new note be given therefor. The debt must be satisfied, and even the taking of a new note which includes an additional loan will not in the absence of an agreement to the contrary discharge the mortgage. It is elementary that if the original mortgage is released through mistake, it may be restored in equity and given its original priority, except as to subsequent purchasers for value and without notice. Bruse v. Nelson, 35 Iowa 157; Port v. Robbins, 35 Iowa 208; St. Croix Lbr. Co. v. Davis, 105 Iowa 27; Sloan v. Rice, 41 Iowa 465; Shaver v. Williams, 87 Ill. 469; American Sav. Bank & Tr. Co. v. Helgesen, 67 Wash. 572. The defendant Brooks was adjudged to be a prior and superior lien holder and properly so under the evidence.

"This record however shows a release of an unsatisfied incumbrance, and the lien so released will be revived for the benefit of the party satisfying it. Justice and equity require that this should be done. When a person through misapprehension and mistake of the law parts with or surrenders a right of property which he would not have surrendered but for such misapprehension a court of equity will grant relief if it is satisfied that the parties benefited by the mistake cannot in conscience retain the benefits or advantages so acquired. Bottorff v. Lewis, 121 Iowa 27; Kerr on Fraud & Mistake, 398, 418.

"A court of equity will not permit a party to take and enjoy the benefits of ignorance or mistake of law on the part of another party who knew and who did not correct. Faxon v. Baldwin, 136 Iowa 519; 2 Pomeroy on Equity Jurisprudence (3d Ed.), Sections 721, 847."

As above pointed out, defendant denied any knowledge of the release of the mortgage or the circumstances incident thereto. He does not claim to have paid anything therefor. He asserts no ground for any prejudice to himself if the release is set aside. His only basis for benefiting thereby, according to his testimony, is that the release was a fortuitous

circumstance about which he knew nothing. Plaintiff, on the other hand, testified that he was requested to release it for defendant's accommodation; that someone he thought was Charles Rittenmeyer called him on the telephone and verified the information given him by defendant. As between plaintiff and defendant the fact question was dependent upon the credibility of the witnesses. We have often said that in an equity case tried de novo here we give substantial weight to the judgment of the trial court, that heard and saw the witnesses, on the question of their credibility. The learned trial court herein believed that plaintiff's testimony was more credible. We fully agree. Accepting plaintiff's version, it is obvious that there was a total failure of consideration and misrepresentation as to the facts which amounted to fraud and, under the general rules heretofore cited plaintiff was entitled to have the release of his mortgage set aside.

IV. Defendant's fourth proposition asserts:

"The court erred in holding that the plaintiff sustained the burden of proving that the note was unpaid and in failing to uphold defendant's plea of payment for the reason that the court's rulings were contrary to the evidence and the authorities."

We find no merit in this contention.

Defendant relies upon our holding in Larson v. Ames Church of Christ, supra, heretofore quoted, for his contention that the burden of proof was on the plaintiff to establish that the note was unpaid. But, granting that plaintiff had such burden of proof, we are satisfied that the decree herein was right on the issue of payment.

As heretofore pointed out, plaintiff testified that the debt was not paid. Defendant testified to the contrary as follows:

"I bought the place described as Lot 5, Block 1, Pleasant Place Addition to Iowa [City]. My dad helped me buy it. The price was $5,350.00 I borrowed $2,250.00 from my father, but he made the note out for $5,350.00. Shortly thereafter, I paid part of the principal on the note, but I couldn't say just how much I did pay each time I paid him. * * * Q. In

other words, state whether or not your father told you two or three years before that that you owed him nothing, that the debt was paid? * * * A. Yes, that's what he said. * * * My father kept the record of all transactions between us. I didn't keep any records of my own. I paid my father the rent from the place. I couldn't say exactly how many years rent, but there was quite a few. I turned the rent over to him every month. I also worked for my father during the months of 1938, 1939, 1940, and 1941, and after each job, whenever we got paid, we'd go home and figure it out between ourselves back in the workshop. We'd always split up the money and then whatever I thought that I needed I'd keep and give him the rest of it. I never got a receipt from my father. When I would ask him for a receipt, he'd just tell me that I was his own son and that I never needed to worry about anything because it would all be mine anyway. I must have paid him at least four or five hundred, about $500.00 a year. In the summer of 1941 he said the debt was paid.''

Defendant's mother testified as follows:

''When Harley was in the army, I turned over all the rent from his place on East Davenport Street to John. Prior to that time, when Harley was in Fort Dodge, I gave most of the rent to John, but I don't remember exactly how long Harley was in Fort Dodge. I saw Harley turn over rent to John while he was home and heard him ask for a receipt, and John said, 'Oh, you're my son, tain't necessary, it will all be yours some day anyway.' I asked John for a receipt when I turned over rent to him. * * * he'd come up to me and say, 'Give me the money,' I'd say, 'Harley demands a receipt this time.' 'The hell with the receipt, I want the money.' * * * My husband, not Harley, kept the records of these payments.''

In rebuttal plaintiff testified as follows:

''My wife didn't turn over to me a nickel of the rent payments that were due Harley from this property upon which I have a mortgage. Harley made two $15.00 payments and I gave him a receipt for each one. * * * Since February 12,

1941, my son, Harley H. Shalla, has made no payments whatever on this renewal mortgage, Exhibit 1. While he was in the armed services, my former wife never at any time turned over any money to me from the rental of his premises. While my son Harley was working with me in the painting and paperhanging business, I paid him for his labor in cash every time we got through with a job; on those occasions Harley never gave me any money to apply on this note and mortgage; I paid him what I owed him, and that was all there was to it. * * * I never told my son Harley H. Shalla nor my former wife, Julia Shalla, that Harley's indebtedness to me on this note and mortgage was paid in full."

This fact question depends primarily upon the credibility of the witnesses that were before the trial court. It believed the plaintiff. We are not disposed to disturb its finding on this issue.

V. Defendant's fifth proposition asserts: .

"The court erred in holding that the plaintiff had sustained the burden of proving that the note and mortgage had been lost for the reason that such holding was contrary to the evidence and the authorities."

We find no merit in this contention.

This is another fact question wherein the trial court considered that plaintiff's testimony was more credible than defendant's. Plaintiff's testimony has been quoted heretofore. Defendant admitted that he secured an envelope, in his father's absence, at the direction of his mother, which contained papers relating to his father's loan to him. He testified:

"It was in July or August, 1941, that I got from the table the envelope containing papers relative to this loan; it was before I went into the service, and while I was in the service, I kept them in a box of my own, a box that I kept locked, at home at 512 Church Street in Iowa City."

Regarding his testimony in the divorce case, he testified herein, as follows:

772

"I think I also testified in that same lawsuit that I got one of the mortgages back; I referred to Defendant's Exhibit B. I never got back the mortgage, Plaintiff's Exhibit 1, dated February 12, 1941, or any note such as Plaintiff's Exhibit 4, alleged to have been made out February 12, 1941."

We are not disposed to disturb the trial court's disposition of this fact question.

VI. Defendant's final proposition asserts:

"The court erred in giving judgment on the note and ordering the mortgage re-established and foreclosed, for the reason that, based on the entire record, such relief was not justified."

What has been said heretofore disposes of this contention. The decree is—Affirmed.

All JUSTICES concur.