FEDERATED MUTUAL IMPLEMENT AND HARDWARE INSURANCE COMPANY, appellee, v. RICHARD E. ERICKSON, appellant.

No. 50331.

(Reported in 110 N.W.2d 264)

August 15, 1961.

Fred S. Nordenson and Ronald E. Runge, both of Sioux City, for appellant.

Shull, Marshall, Mayne, Marks & Vizintos (Mr. Mayne), of Sioux City, for appellee.

PETERSON, J.—This is an action brought by Federated Mutual Implement and Hardware Insurance Company of Owatonna, Minnesota, against Richard E. Erickson to enjoin him from engaging in a certain type of insurance business in Woodbury, Monona and Plymouth Counties for a period of two years, contrary to the terms of a written contract between them.

Plaintiff hired defendant in June 1956, and at its expense brought him to the home office for two weeks training. Plaintiff is a direct writing insurance company and they assigned him to the three above named counties. The contract provided he should devote his full time to the work of plaintiff, and that if he left the employ of plaintiff he was prohibited from engaging in similar type of insurance business in said three counties for a period of two years thereafter. Defendant violated the contract by accepting the agency for three other companies during the time he was working for plaintiff, and also by declaring he was going to engage in a similar business in the Sioux City area immediately after his resignation from plaintiff-company.

On a hearing on January 14 and 15, 1960, as to temporary injunction, the trial court granted such injunction. On the trial of the case on June 28 and 29, 1960, the trial court entered judgment and decree making the injunction permanent for two years from November 30, 1959, the date of defendant's resignation.

Defendant has appealed.

In 1956 defendant was a resident of Montevideo, Minnesota, when he was hired by plaintiff as one of its direct selling agents. He moved his family, consisting of wife and three children, to Sioux City. The parties entered into a written contract on June 1, 1956. This was later superseded by a new written contract dated February 26, 1957. The only change was in connection with method of payment for his services. The following paragraphs were contained in both contracts:

"Paragraph 4. Salesman expressly agrees and states that any and all insurance business at any time or times procured

by the Salesman while employed by the Company is and shall be the permanent and exclusive property of the Employer and for the Employer's exclusive benefit; that the records, use and control of expirations on all such insurance business shall be and remain the absolute and exclusive property of the Employer.

"Paragraph 5. Salesman agrees that he will not, within a period of two years following the date of the voluntary or involuntary termination of his employment with Employer, either directly or indirectly, by and for himself, or as the agent of another, or through others as his agent:

"(a) Engage in, or in any way be connected with, the fire, casualty and accident and health insurance business in the territory assigned to him or worked by him under this or under any other previous Contracts of Employment, if any, with Employer;

"(b) Divulge the names of Employer's policyholders and accounts to any other person, firm or corporation;

"(c) In any way seek to induce, bring about, promote, facilitate or encourage the discontinuance of, or in any way solicit for and in behalf of himself or others, or in any way quote rates, accept, receive, write, bind, broker or transfer any renewal or replacement of any of the insurance business, policies, risks, or accounts, written, issued, covered, obtained (whether through the efforts of the Salesman or not) or carried by the Employer in any territory or territories assigned to the Salesman under this or under any other previous Contracts of Employment, if any, with Employer."

Defendant proceeded to perform his services under the contract and made good progress on behalf of both plaintiff and himself during the period he worked. When he came on the job plaintiff had in force and effect policies of insurance on which the annual premiums were approximately $50,000. In 1957 they rose to $68,700. In 1958 they increased to $79,700, and in 1959 the premiums were approximately $99,000. Defendant's earnings through the years were as follows: last half of

1956, $3284.78; 1957, $6694.21; 1958, $8630.17; 1959 (through November 30) $7501.

Without any previous discussion with his superiors, defendant called the home office on November 30, 1959, and advised them he was resigning as of that date.

Plaintiff sells a full line of fire, casualty, health and accident insurance. It is what is known as a direct writing company, as distinguished from an agency company. A direct writing company operates through full-time field representatives or salesmen, who represent only one company. The agency company operates through independent insurance agents, who usually are agents for several companies.

I. Appellant's first assignment of error is that the restrictive covenants in the agreement between the parties are illegal, as contrary to public policy.

In considering violation of public policy in an agreement such as in the case at bar, four factors are involved: size of the restricted area; the time element; the type of service performed by the covenantor; and the reasonableness of the situation, as applied to the facts of each case. Swigert & Howard v. Tilden, 121 Iowa 650, 97 N.W. 82, 63 L. R. A. 608, 100 Am. St. Rep. 374; Rowe v. Toon, 185 Iowa 848, 169 N.W. 38; Oates v. Leonard, 191 Iowa 1004, 183 N.W. 462; Proctor v. Hansel, 205 Iowa 542, 218 N.W. 255, 58 A. L. R. 153; Haggin v. Derby, 209 Iowa 939, 229 N.W. 257; McMurray v. Faust, 224 Iowa 50, 276 N.W. 95; Sioux City Night Patrol v. Mathwig, 224 Iowa 748, 277 N.W. 457; Larsen v. Burroughs, 224 Iowa 740, 277 N.W. 463; Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377; Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405; 41 A. L. R.2d 15; 43 A. L. R.2d 159; 17 C. J. S., Contracts, section 254; Restatement of the Law, Contracts, section 516(f).

The case of Sioux City Night Patrol v. Mathwig, supra, is somewhat similar to the case at bar. Plaintiff was engaged in a night-patrol business in Sioux City. It hired defendant as an employee. A written contract was entered into between the parties which provided: "[The second party] 'shall not engage in the business of Night Patroling or guarding of the exterior of business properties in Sioux City, Iowa, for a period of

two years after the termination of this contract * * *.' " The services of defendant were terminated, and he proceeded to solicit business houses to engage in patrol duty in competition with plaintiff. The court said at page 752 of 224 Iowa: "The defendant admitted that he had solicited some of the customers of the plaintiff. The list of customers was valuable property of the plaintiff and constituted the main asset of its business. The plaintiff sought to protect this valuable asset and good will by requiring an express covenant from the defendant that he would not engage in the business of night patroling for a period of two years after the termination of the contract."

The trial court sustained a demurrer to the petition. This court reversed saying: "The allegations of the petition, if proven, made a case for injunction."

Contracts similar to the contract between the parties in this action have been sustained in various business and professional fields. There are numerous cases involving professional men, particularly doctors.

In Larsen v. Burroughs, supra, defendant was hired by the Le Mars Clinic. As a part of his written agreement with the clinic he agreed that he would not engage in the practice of medicine or surgery in the city of Le Mars for a period of ten years after severing his connection with plaintiff. A statement by the court at page 743 of 224 Iowa as to the relationship between the parties is as follows: " 'The privilege of a duly licensed physician to practice his chosen profession when and where he may wish is a right which the courts will zealously protect, but it is also a privilege which, by valid, voluntary contract, the physician may restrict; providing that such contractual restrictions are reasonable, and not contrary to public policy.' "

The restricted period in this case was lengthy, but the injunction was granted by the trial court and sustained by this court.

Another case involving doctors is McMurray v. Faust, supra. The restricted time in said case was five years. It was approved by this court.

The case of Proctor v. Hansel, supra, was a similar action

as between osteopathic physicians. The period agreed upon during which defendant should not engage in a competing business in the city of Ames was three years. The trial court granted injunction, which was approved by this court.

In the case of Mutual Loan Co. v. Pierce, supra, an injunction was not granted, on the basis that defendant was simply an employee in the office without any services rendered as to solicitation of customers. His only contact with customers was trying to collect delinquent accounts. The court held he had no opportunity to pirate plaintiff's business. A good statement, however, appears in the case as to the elements which should be present to grant an injunction (page 1057 of 245 Iowa) : "Plaintiff would not be entitled to the injunction without some showing that defendant, when he left plaintiff's employment, pirated or had the chance to pirate part of plaintiff's business; took or had the opportunity of taking some part of the good will of plaintiff's business; or it can reasonably be expected some of the patrons or customers he served while in plaintiff's employment will follow him to the new employment."

The case of Masden v. Travelers' Ins. Co., 8 Cir., 52 F.2d 75, 77, 79 A. L. R. 469, 473, involved a contract between the insurance company and a soliciting agent. In accordance with the contract he was restrained from entering into employment with any other insurance company in the same territory for a period of one year from the date of termination of his contract. In granting the injunction the court said:

"Where the nature of the employment is such that it will bring the employee in personal contact with the patrons and customers of the employer, or will enable the employee to acquire valuable information as to. the nature and character of the employer's business and the names and requirements of the patrons and customers of his employer, thus enabling the employee, by engaging in a competing business, either for himself or for another, to take advantage of such knowledge of his former employer's business, or his acquaintance with the patrons and customers of such employer, *the decisions quite generally hold that a court of equity will interfere on behalf of the employer,* and restrain the breach of a covenant not to

engage in such competing business, providing the covenant does no violence to the rule that the restraint shall not be greater, either as to territory or time, than may reasonably be necessary to protect the business or good will of the employer." (Emphasis ours.)

In the case of Smithereen Co. v. Renfroe, 325 Ill. App. 229, 238, 59 N.E.2d 545, 548, the court said: "The cases involving contracts between employer and employee which contain restrictive covenants prohibiting the employee from engaging in a business competing with that of his employer subsequent to his employment are numerous. We find in this class of cases that the employer's right to injunctive relief depends upon a showing by the employer that, by reason of the character of the employment or the services rendered by the employee, *the employee has had close and intimate contacts with the employer's customers* or has obtained such knowledge of the employer's business that to use such knowledge and acquaintanceship in a competing business would result in irreparable injury to the employer." (Emphasis ours.) See also annotation in 43 A. L. R.2d 160.

As a general statement 17 C. J. S., Contracts, section 254, states: "Generally, while one may not be restrained from following all vocations for which he is fitted, or from doing productive work useful to the community, it is the rule in the absence of contrary statute that agreements by which an employee as part of his contract of employment undertakes not to enter into a competing business on leaving his employer's service are sustained if they are no wider than reasonably necessary for the protection of the employer's business, and do not impose undue hardship on the employee, due regard being had to the interests of the public. Under this rule contracts have frequently been upheld whereby salesmen, agents, canvassers, and other employees who come into personal contact with their employer's customers agree not to engage in a competing business within a limited time or area after leaving their employer's service." Sixty supporting cases cited, from 25 states and Federal Courts.

In the case at bar plaintiff turned over its list of

policyholders to defendant. He became personally acquainted with them, as well as with all new customers acquired by him while working for, and being paid by, plaintiff. Plaintiff's contact with its policyholders was through defendant. The conditions of the contract were reasonable as to both space and time. It covered only the three counties serviced by defendant. The time of two years was reasonable, and not contrary to public policy. With the presence of these elements the ruling of the trial court, that this situation was subject to injunction, was correct.

II. Appellant's second assignment of error is that the findings and judgment of the trial court were contrary to both the evidence and the law.

In addition to the facts heretofore outlined we will state some facts in greater detail.

Early in 1958 defendant commenced to violate the terms of his contract. He acquired the agency of three other insurance companies: Tri-State Mutual Insurance Company, Standard Accident Insurance Company and American National Insurance Company. He failed to disclose this fact to plaintiff. The evidence discloses that in April 1959 he was selling insurance in Tri-State Mutual.

One witness testified: "* * * he [defendant] brought a policy into the office and handed it to me and commenced explaining that it wasn't a Federated policy. He told me it was a different company, but it was just as good. * * * I said, 'I don't think that's right. I have been a Federated policyholder for years and they have dealt very well with me and I don't know why I should want to change.'"

However, under defendant's selling power she kept the policy.

Another witness testified: "I have been a policyholder of Federated Mutual for 12 or 15 years. * * * He [defendant] brought a policy to my home where I paid him cash for the policy and at the time I thought it was the Federated Mutual. * * * He never discussed with me that he was switching the insurance from Federated to Tri-State Mutual."

Six other witnesses testified as to substantially the same experience with defendant.

After defendant resigned on November 30, 1959, he became the licensed agent for Iowa Hardware Mutual Insurance Company and Travelers Insurance Company.

As an illustration of defendant's attitude, and his complete disregard for the provisions of his contract, we quote the following excerpts from his testimony:

"Q. Now you say you do have a prospect list, is that correct? A. Yes, I believe every insurance man has a prospect list.

"Q. What is the form of that prospect list, is it in a file with cards or is it typed out in a long list? A. In a file form."

This is obviously a list of customers he secured when he started employment for plaintiff, together with one developed by him when in plaintiff's employ on a good salary.

He further testified:

"Q. In your selling of insurance since November 30, 1959, you have quoted premium rates to policyholders of Federated Mutual, haven't you? A. Yes, I have. * * *

"Q. Mr. Erickson, I am asking this question: Isn't it true, unless restrained by the court, you intend to keep on operating your insurance agency in the future in the same way you have been doing since November 30, 1959; you see nothing wrong in that do you? A. No, I don't see anything wrong in it.

"Q. And you intend to do it? A. I hope to, yes."

The premiums paid by the various customers whom defendant pirated from plaintiff add up, as the trial court found, to between $25,000 and $30,000 per annum.

Defendant cites only three cases in support of his contention. They are not comparable as to facts in the case at bar, nor do they support reversal.

Brecher v. Brown, supra, was an action between two veterinarians. The restriction was unlimited as to time, and covered Storm Lake and a radius of 25 miles therefrom. Defendant was only with plaintiff nine months; not sufficient to seriously interfere with his clientele. For these obvious reasons the injunction was denied.

We have already considered Mutual Loan Co. v. Pierce, supra.

The third was a case plaintiff had in Arkansas. McCumber v. Federated Mutual etc. Ins. Co., 230 Ark. 13, 320 S.W.2d 637. Defendant entered new territory, where there were no customers. For some reason the agent was not able to get service from the home office, and became discouraged and quit. No such condition pertained as to defendant herein. The Arkansas court denied injunction. At any rate, if the decision is contrary to our numerous decisions in Iowa supporting the trial court, we do not accept it.

The facts, and the law which we have outlined in Division I, clearly support the trial court.

III. Appellant's third assignment of error is that plaintiff's failure to file a Reply to new matters in the Answer entitles defendant to a judgment of dismissal.

Defendant bases this claim on R. C. P. 73. The rule provides: "There shall be a reply * * * to new matter in an answer, responding thereto in the same manner that an answer responds to a petition * * *."

Careful consideration of the petition and the answer discloses that one by one the paragraphs in the petition were listed and answered. The possible exception to this careful listing, in the answer of each paragraph in the petition, is paragraph 15. Said paragraph is only a listing of legal theories, all of which are integral in consideration of the case as a whole.

If the facts stated in the petition contradict facts stated in the answer, the issues are joined without the necessity of a reply. Stacy & Thomas v. Stichton & Co., 9 Iowa 399; State ex rel. Kuble v. Capitol Ben. Assn., 237 Iowa 363, 21 N.W.2d 890; Shalla v. Shalla, 237 Iowa 752, 764, 23 N.W.2d 814, 820.

In Shalla v. Shalla, supra, the court said: "Here the petition alleged that defendant had only paid $30 to apply on interest, had been in default since August 12, 1941, and the amount due on the note on November 20, 1944 (return day) was $2893.55. When defendant alleged that the note was paid, such assertion completed the issue. A reply was not necessary for that purpose."

■ Where parties proceed to try an issue without raising any question as to reply, it amounts to consent to try the issue and it is rightfully in the case. State ex rel. Kuble v. Capitol Ben. Assn., supra; Shalla v. Shalla, supra; Verlinden v. Godberson, 238 Iowa 161, 166, 25 N.W.2d 347, 350; Wilson v. Corbin, 241 Iowa 593, 605, 41 N.W.2d 702, 709; R. C. P., Revised Edition, by Cook and Loth, Rule 73, Reply, Author's Comment, pages 493, 494; Andrew v. Miller, 216 Iowa 1378, 1381, 250 N.W. 711, and citations; 41 Am. Jur., Pleading, section 396.

In Wilson v. Corbin, supra, the court said: "Where parties proceed without objection to try an issue, even though not presented by the pleadings, it amounts to consent to try such issue and it is then rightfully in the case."

In Verlinden v. Godberson, supra, the court stated: "Appellant did not attack the petition or challenge its sufficiency by motion or other pleadings; neither did he object to the introduction of the thirty-day notice or the three-day notice when offered in evidence. When appellee offered evidence to show waste, no objection was made that such evidence was not within the pleaded issue. Having gone to trial on the petition, and having litigated the issue raised without objection, and not having objected to evidence offered to establish such claim of waste, we do not think that the objection now made by appellant can be of any avail to him."

In Cook's Iowa Rules of Civil Procedure, Volume 1, page 493, Rule 73 is considered. As part of the Author's Comment, it was stated: "The Rule means that new matter not replied to is admitted without proof: [Citing cases] But if the facts stated in the petition already contradict the 'new facts' stated in the answer, the issue is made without a reply, which, in such cases, is not demanded by this Rule: [Citing cases] The purpose of requiring the reply was to narrow the actual fact disputes, without implying denials not made. This purpose is attained by dispensing with a reply when the prior pleadings make the dispute plain."

For both reasons above outlined, in the instant case no reply was necessary.

1220

The decree and judgment of the trial court are affirmed.—Affirmed.

All JUSTICES concur.